UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
TEXARKANA DIVISION

CITY OF TEXARKANA, ARKANSAS                                    PLAINTIFF

v.                          Case No. 4:10-CV-04067

CITY OF TEXARKANA, TEXAS                                       DEFENDANT

## OPINION AND ORDER

The Plaintiff in this action, City of Texarkana, Arkansas ("Arkansas City") filed an

Application to Compel Arbitration and to Stay Administrative Actions Pending Arbitration (Doc.

1) against the Defendant, City of Texarkana, Texas ("Texas City") concerning disputes over the

operation of the integrated water and sewer systems between the two border cities.

## I.  INTRODUCTION

Arkansas City instituted this action to compel arbitration of disputes under the Federal

Arbitration Act, 9 U.S.C. §1 *et seq.*  Arkansas City alleges that the disputes it has identified as being

subject to arbitration arise out of a written contractual agreement between the two cities known as

the Amended and Restated Water System Agreement dated October 15, 1985 ("1985 Agreement").

The 1985 Agreement contains an arbitration clause that provides that "any dispute" between the

parties as to "any of the rights, duties, or obligations arising out of this Agreement" shall be resolved

through arbitration.  (Doc. 1-1, ¶ 16).  Arkansas City has enumerated the following disputes, which

it alleges are subject to arbitration pursuant to the 1985 Agreement (as submitted by Arkansas City

pursuant to the Court's Order (Doc. 34)):

> **(AR1)** The following unilateral actions taken by City Manager of Texas City on
> April 1, 2010:

Page 1

> (a)   Withdrew the TWU Dirctor's authority to act and speak on behalf of Texas City;
>
> (b)   Ordered that Texas City assume direct and exclusive control over all TWU "purchases or projects that involve more than fifty percent (50%) of funding received or derived from Texas funds;" and
>
> (c)   Ordered that Texas City assume direct and exclusive control over all TWU employment activities involving Texas funds.

**(AR2)**  Texas City's sale and distribution of treated water from Millwood Reservoir to Texas users outside the City of Texarkana, Texas, without the approval of the City of Texarkana, Arkansas and Southwest Arkansas Water District.

**(AR3)**  Texas City's failure to allow Arkansas City to inspect attorney's fee statements sent to the Texas City by its legal counsel, the amount of which TWU was directed to pay by Texas City's City Manager.

**(AR4)**  Texas City's planned transfer of the water treatment function of its water system to Riverbend Water Resources District.

Texas City denies that any of Arkansas City's enumerated disputes fall within the scope of the arbitration clause of the 1985 Agreement or are otherwise subject to arbitration. Further, Texas City separately seeks an order of the Court compelling arbitration as to the following enumerated disputes, should the Court find that they are governed by the 1985 Agreement (as submitted by Texas City pursuant to the Court's Order (Doc. 34), but omitting certain legal arguments):[1]

---

[1] Texas City filed a Motion for Leave to File Amended Answer on January 12, 2012 (Doc. 32), which Arkansas City opposed (Doc. 33). The Court denied Texas City's Motion by Order dated January 25, 2012 on the grounds that the proposed amended answer asserted new affirmative defenses and counterclaims which appeared to inappropriately go the merits of the disputes between the parties. (Doc. 34). In that same Order, however, the Court directed the parties to define the actual disputes existing in this action by submitting to the Court either a stipulation or a separate statement by each party as to its proposed definition of the actual disputes. Texas City submitted three defined disputes that had appeared as "counterclaims" in its proposed amended answer. Arkansas City, therefore, had at least some notice of Texas City's disputes by January 12, 2012. The disputes were also submitted to the Court, with a copy to Arkansas City's counsel, on April 3, 2012. In the interest of judicial efficiency, the Court will consider the disputes presented by Texas City as well as those originally presented in this action by Arkansas City, as Texas City presented those disputes to the Court in compliance with a Court Order.

**(TX1)** From 2000 to date, Texas City overpaid its contracted share of bonded indebtedness under the 1985 contract in excess of $200,000.00.

**(TX2)** Paragraph 17 of the 1985 contract — providing for title to water purchased under the contract passing to Texas City at the point of delivery, and providing for a hold harmless provision after title has passed — is an essential provision of the 1985 contract and is not severable. Arkansas City's contention of restrictions on Texas City's title to water purchased and delivered under the 1985 contract is a repudiation of paragraph 17.

**(TX3)** Texas City overpaid the funding allocation for fiscal years 2001 through 2009.

### A.  JURISDICTION

This action was brought pursuant to the provisions of the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq.*  There is no dispute that the agreement at issue in this case involves interstate commerce and is, therefore, covered by the provisions of the FAA.  The FAA "bestows no federal jurisdiction but rather requires an independent jurisdictional basis." *Northport Health Servs. of Ark., LLC v. Rutherford*, 605 F.3d 483, 486 (8th Cir. 2010) (internal quotation omitted).  Complete diversity exists in this case, as the parties are two municipalities which straddle the border between two states – Arkansas and Texas.  The amount in controversy requirement is also met, as the total value at stake in this litigation, which involves the management of the water and sewer systems for both municipalities, exceeds $75,000, exclusive of interest and costs. This Court, therefore, has jurisdiction under 9 U.S.C. § 4 in conjunction with 28 U.S.C.  § 1332(a).

### B.  PROCEDURAL HISTORY

Arkansas City filed its Application to Compel Arbitration and Stay Administrative Actions on May 20, 2010. (Doc. 1). On June 14, 2010, Texas City filed a Motion for Referral to Mediation. (Doc. 6). After several rounds of briefing from the parties, this action was ultimately scheduled for

a settlement conference by Order of Magistrate Judge Barry Bryant on December 3, 2010.  The case was reassigned from District Judge Harry Barnes to the undersigned on March 10, 2011.  From at least April through June of 2011, the parties engaged in continuing mediation with Magistrate Judge Bryant. The two Cities, however, were ultimately not able to amicably resolve their issues. The Court held a status conference in the Texarkana federal courthouse on September 26, 2011.  After hearing arguments at the status conference and conferring with the parties on an agreeable date, a bench trial was set in this matter for April 9, 2012.  The Final Scheduling Order allowed the parties to conduct limited discovery concerning the issue of arbitrability only.  The Court conducted a non-jury trial of this action on April 10-11, 2012.[2]

Arkansas City and Texas City jointly submitted written Stipulations of Facts before the trial which both sides referred to during the trial.  Those Stipulations, along with the testimony of the witnesses at trial and the exhibits received into evidence, as well as the parties' lengthy pleading history, form the basis for the Court's findings of fact set forth below.  To the extent there were conflicts in the testimony of witnesses, the Court weighed the credibility of the witnesses and their testimony in making its findings of fact.  *See United States v. Mendoza*, 677 F.3d 822, 827 (8th Cir. 2012) (stating that, where a trial judge's credibility determination is not contradicted by extrinsic evidence or not internally inconsistent, such determination "can virtually never be clear error"). Both parties also submitted Post-Trial Briefs, which have been read and considered by the Court. (Docs. 67-68).

### C. CONSIDERATION OF PAROL EVIDENCE

---

[2] The Court re-scheduled the bench trial to move it one day later from the previously-scheduled April 9th date.

The Court's findings of fact include information regarding the parties' contracting history and course of performance as such facts relate to interpretation of the 1985 Agreement. As those facts are external to the 1985 Contract, before setting forth the facts relevant to resolution of this case, the Court will first address the admissibility of such parol evidence in this action. Before trial, the parties – through their various pleadings – addressed the issue of whether or not the Court should consider parol evidence as to the parties' prior contracting history and the parties' overall course of dealing in determining whether the enumerated disputes were within the scope of the arbitration provision of the 1985 Agreement. The Court raised the issue with the parties again just prior to trial. Arkansas City contended that parol evidence was admissible to explain the terms of the contract. Texas City contended that parol evidence was inadmissible because the terms of the contract were unambiguous.

"Whether a contract is ambiguous is a question of law for the court, and extrinsic evidence should not be considered to create an ambiguity where there otherwise would be none." *Cont'l Holdings, Inc. v. Crown Holdings, Inc.*, 672 F.3d 567, 578 (8th Cir. 2012) (internal quotation omitted). However, if the Court finds that a contract term is ambiguous, the proper procedure is to allow the parties to present extrinsic evidence. *Id.*; *see also C & A Construction Co. Inc. v. Benning Construction Co.*, 256 Ark. 621 (1974) ("[T]he initial determination of the existence of an ambiguity rests with the court and if ambiguity exists, then parol evidence is admissible and the meaning of the term becomes a question for the factfinder."). "Arkansas's parol evidence rule bars the introduction into evidence of any prior agreement of the parties that contradicts the terms of an unambiguous contract. *See* Ark. Code Ann. § 4-2-202. However, the Arkansas Supreme Court has declared that evidence of 'a course of dealing that explains or supplements a contract is competent evidence of

the parties' intent and can become part of a contract.'" *P & O Nedlloyd, Ltd. v. Sanderson Farms, Inc.*, 462 F.3d 1015, 1019 (8th Cir. 2006) (quoting *Bank of Am. v. C.D. Smith Motor Co.*, 353 Ark. 228 (Ark. 2003)); *accord* Ark. Code Ann. § 4-2-202(a) (allowing the terms of a contract to be "explained or supplemented by course of performance, course or dealing, or usage of trade"). Further, in interpreting Minnesota's parol evidence rule, MINN. STAT. § 336.2-202, which is identical to Arkansas's parol evidence rule, the Eighth Circuit has stated that "explanatory or supplemental evidence of the course of dealing *or course of performance* by the parties is admissible, as is evidence of consistent additional terms unless the writing is intended by the parties to be a complete and exclusive statement of the terms of the agreement." *Best Buy Co. v. Fedders N. Am., Inc.*, 202 F.3d 1004, 1008 (8th Cir. 2000) (emphasis added). The 1985 Agreement does not contain an integration clause, such that extrinsic evidence would not otherwise be barred if the terms of the Agreement are found by the Court to be ambiguous. *PlaNet Prods. v. Shank*, 119 F.3d 729, 732 (8th Cir. 1997) (stating that an integration clause "is a strong indication that the parties intended for the Agreement to be complete and final" in reference to applicability of the parol evidence rule). Parol evidence is also admissible under Arkansas law to "bring out [a] latent ambiguity" in a contract. *Jet Asphalt & Rock Co. v. Angelo Iafrate Constr., LLC*, 431 F.3d 613, 617 (8th Cir. 2005) (quoting *Countryside Cas. Co. v. Grant*, 269 Ark. 526 (Ark. 1980)).

The Court made a preliminary ruling at trial that certain provisions of the 1985 Agreement concerning the joint operation of the Cities' respective water and sewer systems were ambiguous, and that extrinsic evidence of the parties' course of dealing and course of performance would be admissible to aid the Court in interpreting the intended meaning of that provision of the contract. After the trial of the case, the Court requested that the parties submit post-trial briefs, and in

particular, the Court asked the parties to address the parol evidence rule as it relates to evidence of course of performance, particularly the parties' course of conduct post-1985, as to which the Court heard a substantial amount of evidence at trial.

Based on all the briefings presented to the Court, as well as the arguments presented at trial, the Court upholds its preliminary finding of ambiguity. Specifically, the Court finds that the phrases "joint operating arrangements previously approved by both cities" and "joint operation of [the] respective water and sewer systems" in the 1985 Agreement are ambiguous. The Court is entitled, therefore, to consider the extrinsic evidence presented by the parties (both pre-1985 course-of-dealing evidence and post-1985 course-of-performance evidence) as it relates to clarifying – not amending – the meaning of the ambiguous provisions.

The Court finds, further, that due to the nature of the parties' joint operating history, parol evidence is admissible in this case to bring out and clarify a latent ambiguity in the term "Texarkana Water Utilities," as used at various points throughout the 1985 Agreement. It appears to the Court that the parties have entered into no written agreement concerning the "joint operation" of the two Cities' water and sewer systems by "Texarkana Water Utilities" or any other entity, even though the evidence indicates that the systems have been jointly operated since prior to 1948. Furthermore, "Texarkana Water Utilities" has not been consistently referenced by the parties as the entity in control of the operation, and the parties are in disagreement over what "Texarkana Water Utilities" actually is – a department of Texas City or an entity independent of either city but jointly controlled by each. As there is no written agreement specifically concerning either the organization or management of Texarkana Water Utilities or the general joint operation of the two cities' water and sewer systems, the Court heard extrinsic evidence to clarify what "Texarkana Water Utilities" was

Page 7

and what was intended by the parties in reaffirming the "joint operation" of the two Cities' water and sewer systems by TWU.

The Court, therefore, includes in its recitation of the facts, certain relevant facts pertaining to the parties' contracting history and course of performance as they relate to the joint operation of the two Cities' water systems. Any evidence that the Court ultimately found to be irrelevant or inadmissible was not considered by the Court and is not included in this opinion.

### D. FACTUAL BACKGROUND – CONTRACTING HISTORY

Arkansas City and Texas City are adjoining municipalities separated by the border between the states of Arkansas and Texas. Each city has a water and sewer system to serve their respective customers, and the two systems have been interconnected and operated together since at least 1948. The Cities entered into their first contract related to the Cities' water and sewer systems in 1948 ("1948 Contract"). (Doc. 4-1). The 1948 Contract was for a term of 30 years. Under Section 3 of the 1948 Contract, the cities agreed that the water and sewer system of Texas would be operated by a special board appointed by the City Council of Texas City, and the water and sewer system of Arkansas would be operated by a special board appointed by the City Council of Arkansas City. Section 3 further provided that since the systems were interconnected and, even then – prior to the signing of the contract in 1948 – operated as a single unit, a general manager would be selected with the approval of both boards whose duty it would be to look after the general management and operation of the water and sewer systems of both Cities. Section 14 of the 1948 Contract contains an arbitration clause that is basically identical to the arbitration clause in the 1985 Agreement.

Section 3 of the 1948 Contract was amended in 1965 ("1965 Amendment") to state that the Texas system would be operated as an administrative department of Texas City, and the Arkansas

system would be operated by a Special Board known as the Texarkana, Arkansas Board of Public Utilities. (Pl. Trial Exh. 3). The 1965 Amendment further provided that all matters pertaining to the operations of both systems would be under the control and jurisdiction of the City of Texarkana, Texas and the Texarkana, Arkansas Board of Public Utilities. The 1965 Amendment further provided that the "systems of both cities shall be placed under the general supervision of an individual to be selected with the approval of both cities, whose duty it shall be to look after the operations of the water and sewer systems of both cities . . ." *Id.* The compensation of the supervisory individual was to be "prorated between Texas and Arkansas in the same proportion as water distributed by the two water systems is allocated to the two cities . . ." *Id.* The 1948 Contract, as amended in 1965, expired in 1978.

The parties entered into a contract in 1957 ("1957 Contract") (Doc. 4-2) to govern the rights of the Cities to a new supply of water from Lake Wright Patman[3] located in the state of Texas. The 1957 Contract was for a term of 50 years. The 1957 Contract acknowledged the 1948 Contract, and stated that the new contract did not supercede or amend the 1948 Contract. The 1957 Contract did not contain any new substantive provisions regarding the operation and management of the two cities' water and sewer systems. Section 12 of the 1957 Contract did provide that Texas City would keep detailed and accurate accounts of all direct and indirect expenses for the operation and maintenance of the supply and  transmission system as well as the distribution system. Section 12

---

[3] In both the 1957 and 1969 Contracts, Lake Wright Patman is referred to by its former name, Texarkana Reservoir. *See* 1982 Contract, Doc. 37-2, p. 59 (noting that Texas City had formerly contracted with Arkansas City – in 1948, 1957, and 1969 – to supply Arkansas City with water "from Lake Wright Patman (formerly Texarkana Reservoir)"). Since Texarkana Reservoir is presently referred to as Lake Wright Patman, and that is how the parties have referred to it, the Court will refer to Lake Wright Patman throughout this Opinion and Order, in order to maintain consistency.

further provided that the Board created for the operation of the Texas City water system would allocate costs based on a detailed study made by an independent accountant selected jointly by the Texas City Board and the Arkansas City Board.  Any disputes were to be resolved by the arbitration provision contained in Section 18, which is almost identical to the arbitration provision of the 1985 Agreement.

The two Cities signed another water supply contract in 1969 ("1969 Contract") (Doc. 4-3), which governs the rights of the Cities to an increased supply of water from Lake Wright Patman over and above what had been contemplated by the parties in 1957.  The 1969 Contract is for a term of 50 years (Doc. 4-3, § 9) and was specifically reaffirmed by the 1985 Agreement (Doc. 1-1, § 19). The 1969 Contract states that, "except for the retention of some features of a contract previously entered into by [the two cities]," the 1969 Contract is to supersede all prior contractual arrangements relating to Texas City's obligation to supply treated water to Arkansas City.  In the 1969 Contract, it is acknowledged and understood that Texas City has water contracts with other Texas cities. Texas City therefore has obligations to those "other area cities" regarding the increased water supply from the Texarkana Reservoir that had been acquired by Texas City pursuant to a permit issued by the Texas Water Rights Commission in 1968.  The Contract does not contain any new provisions for the operation and maintenance of the two Cities' water systems.[4]  Section 15 of the 1969 Contract again contains an arbitration clause that is basically identical in every material respect to the arbitration clause in the 1985 Agreement.

In 1982, the two Cities entered into a new contract ("1982 Contract") (Doc. 37-2, p. 59-87)

---

[4] The 1969 Contract expressly covers only water and did not supersede or amend any prior arrangements between the parties as to sewer services. (Doc. 4-3, p. 5).

to develop a new supply of water from the Millwood Reservoir located in Arkansas.  The 1982 Contract was amended by the Cities in 1985, with the amendments primarily relating to the amount of the refunding bonds issued to finance the acquisition, construction and equipping of certain waterworks from the Millwood Reservoir.  The remaining provisions are materially identical in both contracts.  The 1985 Agreement, amending the 1982 Contract, is the agreement which contains the arbitration clause at issue in this case.

In both the 1982 and 1985 contracts, the two Cities recognize, acknowledge, and agree as follows[5]: Arkansas City had a pre-existing water supply contract with the Southwest Arkansas Water District, a regional water distribution district, which reserved a certain quantity of water allocated to the district from the Millwood Reservoir.  (Doc. 1-1, p. 3).  Arkansas City agrees to supply Texas City with treated water from the Millwood Reservoir at various points on the interconnected water system.  (§ 1).  Other Texas cities being supplied water from Lake Wright Patman under separate contracts are not to receive water from the Millwood Reservoir without the express approval of Arkansas City's Board of Directors.  *Id.*  The 1969 Contract is to remain in full force and effect and is not superseded or modified by either the 1982 Contract or 1985 Agreement.  (§ 19).  The 1982 Contract and 1985 Agreement also contain the following provisions of particular relevance to the case at hand:

> 6.  <u>Records of Both Cities Open to Inspection</u>.  All records and accounts kept by Texas City and Arkansas City pertaining to the operation by each of its water system including but not limited to records of all sales of water, shall be open to inspection during regular business hours by the other City and its accredited representatives.
>
> . . .

---

[5] Citations to particular sections refer to the same section in both the 1982 Contract and the 1985 Agreement.

10. <u>Texarkana Water Utilities to be Representative</u>.   The parties agree and acknowledge that the separate water and sewer system of each is currently operated and managed by Texarkana Water Utilities, under joint operating arrangements previously approved by both cities.   The parties hereby confirm and approve the continued joint operation of their respective water and sewer systems by Texarkana Water Utilities.   So long as Texarkana Water Utilities continues to operate and manage the water system of Arkansas City, performance by Texarkana Water Utilities of any duties, responsibilities or obligations of Arkansas City hereunder shall be complete and sufficient performance of Arkansas City.

. . .

16. <u>Arbitration of Disputes</u>.   In the event that any dispute shall arise as to any amounts due hereunder, or the carrying out of any of the rights, duties, or obligations arising out of this Agreement,[6] such dispute shall be settled by arbitration, and to that end each city shall select a disinterested representative who shall be either a qualified registered engineer or certified public accountant experienced in waterworks accounting matters and the two thus selected shall choose a third person similarly qualified and the three so selected shall constitute an arbitration board to make investigation and to fix the amount so payable, or otherwise determine the matter in dispute, which determination shall be binding on both Arkansas City and Texas City. The cost of each arbitration shall be borne equally by the two cities.

17. <u>Title to Water</u>.   Title to all water to be supplied under this Agreement shall remain in Arkansas City to the point of delivery to Texas City, at which point title to water delivered to Texas City shall pass to Texas City.   Each party agrees to save and hold the other harmless from all claims, demands and causes of action which may be asserted by any person on account of the transportation, delivery or disposal of water delivered under this Agreement after title has passed to such party.

(Docs. 1-1 and 37-2).

The 1985 Agreement has a term that began with the issuance of the refunding bonds for the

waterworks project and continues for a period that any of the bonds are outstanding and unpaid.

(Doc. 1-1, § 9).   Thereafter, either City has the right to extend the term of the Agreement upon terms

---

[6] The arbitration clause contained in the 1982 Contract and 1985 Agreement is essentially the same as the arbitration clauses used in the previous contracts between the two cities, except that the word "Agreement" was capitalized for the first time in the 1982 Contract, and then again in the 1985 Agreement.

Page 12

agreed upon at the time. The 1985 Agreement is still in effect.

## II.  DISCUSSION AND ANALYSIS

### A.  NATURE OF ACTION

 Arkansas City seeks an order under the Federal Arbitration Act ("FAA"), 9 U.S.C. § 4, compelling Texas City to submit the Arkansas disputes to binding arbitration.  Texas City likewise seeks an order of the Court compelling its identified disputes to arbitration.  "By its terms, the FAA 'leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed.'" *Pro Tech Indus. v. URS Corp.*, 377 F.3d 868, 871 (8th Cir. 2004) (quoting *Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 218 (1985)) (emphasis in original). "A court's role under the FAA is therefore limited to determining (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute." *Id*.  The parties do not dispute that the arbitration provision of the 1985 Agreement is valid.  The only issue for the Court to determine, then, is whether the parties' disputes are encompassed by that arbitration provision. In deciding this issue of arbitrability, the Court is mindful that it is not to weigh the merits of the parties' disputes, but to simply determine arbitrability of all the identified disputes – not merely those which the Court deems meritorious.  *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 651-52 (1986). "An order to arbitrate [a] particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *United Steelworkers of Am., AFL-CIO-CLC v. Duluth Clinic*, *Ltd.* 413 F. 3d 786, 788 (8th Cir. 2005) (quoting *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582-83 (1960)).

### B.  SCOPE OF THE ARBITRATION PROVISION IN THE 1985 AGREEMENT

In deciding whether the parties' disputes are encompassed by the arbitration provision in the 1985 Agreement, the Court must first decide if the arbitration clause is broad or narrow.  *Duluth Clinic*, 413 F.3d at 788.  The Eighth Circuit has construed as "broad" an arbitration clause encompassing "[a]ny controversy or claim arising out of or *relating to* [the] Agreement."  *Fleet Tire Serv. of North Little Rock v. Oliver Rubber Co.,* 118 F.3d, 619, 620-621 (8th Cir. 1997) (emphasis added).  Such a broad provision would subject to arbitration collateral disputes that were merely *related to* the agreement.  *Id.* at 621.  On the other hand, the Eighth Circuit has construed as "narrow" arbitration clauses which have scopes limited to disputes arising under the agreement in which the arbitration clause is contained.  *See Duluth Clinic* 413 F. 3d at 789 (finding as narrow a clause requiring all "grievances" be submitted to arbitration when "grievances" was defined in agreement as "any claim . . . alleging a violation of a specific contract provision or adherence to the terms and provisions of this Agreement"); *Lebanon Chem. Corp. v. United Farmers Plant Food, Inc.*, 179 F.3d 1095, 1101 (8th Cir. 1999) (finding as narrow a clause requiring arbitration of all disputes "arising from a contract started or concluded under *these rules*" (emphasis added)).

The Court finds that the arbitration clause in the 1985 Agreement is "narrow" in scope.  The clause lacks the distinguishing broad language in *Fleet* covering disputes "arising out of *or relating to*" the contract.  *See Lebanon Chem. Corp.* 179 F.3d at 1101 ("The *Fleet Tire* court expressly relied on the additional and more general phrase '*relating to*' to find that the arbitration clause was broad." (emphasis in original)).  Instead the scope of the arbitration clause is limited to disputes "arising out of *this Agreement*."  (Doc. 1-1, § 16) (emphasis added).  Use of the specific qualifier "this" and the capital "A" in "Agreement" both serve to narrow the scope of the arbitration clause.  *See Duluth*

*Clinic*, 413 F.3d at 789 (finding as significant the fact that "Agreement" was capitalized in the arbitration provision).  Furthermore, by the terms of the arbitration provision, only disputes "arising out of" the 1985 Agreement, and not those merely related to it, are covered.

Since the Court has construed the arbitration clause at issue as narrow, the next step is for the Court to determine whether any of the matters in dispute "involve[] an agreement collateral to the agreement containing the arbitration clause." *Fleet Tire*, 118 F.3d at 621 (applying *Prudential Lines, Inc. v. Exxon Corp.*, 704 F.2d 59 (2d Cir. 1983)).  "A 'collateral' agreement is a separate, side agreement, connected with the principal contract which contains the arbitration clause.  The burden is on the party resisting arbitration to demonstrate that the disputed issue is collateral." *Duluth Clinic,* 413 F.3d at 790 (quoting *Prudential Lines,* 704 F.2d at 64).  An agreement may be construed as collateral if it is a contract set apart and distinct from the main agreement.  *Id.* (citing *Cornell Univ. v. UAW Local 2300*, 942 F.2d 138, 140 (2nd Cir. 1991)).  "Arbitration of collateral matters may not be 'compelled merely based upon the existence of an arbitration clause in the main agreement.'" *Id.* (quoting *Prudential Lines,* 704 F.2d at 64).

Disputes arising under a collateral agreement must be differentiated, however, from disputes that arise under the main agreement but require determination of a sub-issue.  *Prudential Lines* 704 F.2d at 64.  The latter is a dispute which "is inextricably tied up with the merits of the underlying dispute" and "wholly derivative of issues that fall within the scope of the arbitration clause."  *Id.* (quoting *McAllister Bros. v. A & S Transp.* Co*.*, 621 F.2d 519, 523 (2d Cir. 1980)).

The Court will address each of the parties' identified disputes in turn.

### C. ARBITRABILITY OF DISPUTES

#### 1.  AR1: UNILATERAL ACTIONS BY TEXAS CITY MANAGER

The first dispute raised by Arkansas City arises out the "joint operating arrangements" referred to in section 10 of the 1985 Agreement (set forth in full, *supra*, section I(D)), which states that the parties acknowledge that their separate water and sewer systems are "operated and managed by Texarkana Water Utilities, under joint operating arrangements previously approved by both cities." (Doc. 1-1, § 10).   In section 10, the parties "confirm and approve the continued joint operation of their respective water and sewer systems by Texarkana Water Utilities." *Id.*

Texarkana Water Utilities ("TWU") is an unincorporated entity that manages and operates the two Cities' separate but integrated water and sewer systems.   William D. King has been the director of TWU for over 20 years – from 1991 to the present.   Larry Sullivan became City Manager for Texas City in 2007.   At some point thereafter, Texas City found some discrepancies in the amounts that Texas City was being charged for its share of TWU costs.   The costs of operating the integrated system are allocated to the two Cities in proportion to the amount of water consumed by each City and are adjusted periodically.   According to the testimony at trial, Texas City officials began to feel that they could not fully trust King to handle the portion of TWU funds comprised of funds from Texas City.   Ultimately Sullivan sent a memo to King that contained certain directives which King was to follow (see AR1, section I, *supra*).

King did not believe it was possible for him to follow Sullivan's directives, because the directives pertaining to purchasing and employment activities necessarily involved not only Texas funds, but Arkansas funds as well.   In fact, because Texas City uses a proportionately larger amount of water, Texas City is responsible for more than 50% of most day-to-day costs.[7]   Therefore,

---

[7] At trial, Texas City made much of the fact that it pays more into TWU than does Arkansas City.   Both Cities, however, pay a share of the TWU costs proportionate to their citizens' use of the water and sewer systems.   Therefore, assuming the cost allocation is correctly calculated, Texas City

Sullivan's directives essentially revoked King's authority regarding all day-to-day purchases (not including larger purchases, which had to be approved by both Cities). King felt that he could not allow Sullivan to have control over his management of those activities without approval from the Arkansas City Manager, Harold Boldt. King was also concerned that, because he no longer had authority to speak on behalf of Texas City and, therefore, could no longer sign off on certain reports required to be filed with federal and state agencies, that delegation of that responsibility to a Texas City representative could result in fines being imposed against either or both Cities. Boldt opposed Sullivan's directives, because he believed it effectively ceded control of all operations and management of both systems to Texas City and effectively terminated King's employment as director of TWU.

Texas City contends that TWU is not a separate entity, but has in fact always been a department of Texas City, subject to its control, authority and supervision. Texas City further contends its City Manager had authority to issue the directives to the director of TWU without the approval of the City Manager of Arkansas City because the directives only involved Texas funds.

The 1985 Agreement, itself, does not define the "joint operating arrangements" referred to, and does not refer to any specific written agreement setting out those arrangements. As stated above, the Court admitted extrinsic evidence in order to determine, and to clarify, the nature of any "previously approved" "joint operating arrangements." The Court looked first to the previous written contracts entered into by the two parties.

Based on the testimony of the witnesses at trial, TWU evolved over the years as the entity

---

and Arkansas City pay the same proportionate amount – the amount due for their own citizens' use of the integrated water and sewer system.

Page 17

that operates and manages the two water systems. While the name "Texarkana Water Utilities" did not surface until the mid-1970's, a joint entity that operates and manages the two systems has been in place since at least 1948. In the 1948 Contract, a general manger was to be selected by both Cities to "look after" the general management and operation of both systems. (Doc. 4-1, § 3). Under the 1965 Amendment to the 1948 Contract, the water and sewer systems of both Cities was still to be placed "under the general supervision of an individual to be selected with the approval of both cities." (Pl. Trial Exh. 3). Section 3 of the 1948 Contract was, however, amended to provide that the Texas City system was to be operated "as an administrative department" of Texas City instead of by a "Texarkana, Texas Utilities Board" to be created and appointed by the City Council of Texas City. *Id.*

In contending that TWU is wholly an administrative department of the City of Texarkana, Texas – and not a separate joint entity of the two Cities – Texas City relies largely on a 1975 Texas City ordinance that created a "Department of Water Utilities" with a "Director of the Department of Water Utilities" to be appointed by, and subject to the direction of, the City Manager of Texas City. (Doc. 4-4). Pursuant to the ordinance, "All activities of the Texarkana Water and Sewer System are hereby transferred and assigned to the Department of Water Utilities." *Id*.

Regardless of the language set forth in the ordinance, the Court does not find Texas City's argument to be credible, as the entity that operated and managed the two systems existed long before the adoption of the 1975 ordinance. From 1948 to the present, this entity has continued to exist in an unincorporated status, adopting the name of "Texarkana Water Utilities" in the mid-1970's. TWU has a federal tax identification, files tax reports, and has bank accounts to deposit payments from customers - all in the name of TWU, not a "Department of Water Utilities." TWU processes water

from both Millwood Reservoir on the Arkansas side and Lake Wright Patman on the Texas side, and serves customers of both Arkansas City and Texas City.  Furthermore, both King and TWU's previous director were selected by the City Councils of both Cities – not simply appointed by the City Manager of Texas City.  The testimony at trial also showed that the employees who perform the duties of operating and managing the two Cities' systems work under the supervision of the director of TWU who reports to both City Managers.  The evidence also showed that both Cities are involved in decisions that require authority above the director's level, such as decisions regarding the purchase of equipment that requires competitive bids.  Based on the contractual history and the course of performance of the parties, TWU is a separate unincorporated entity subject to the control of both Texas City and Arkansas City.

The question as to whether the "joint operating arrangements" of TWU are collateral to the 1985 Agreement may initially appear to be a close question, because of the parties' explicit reaffirmation and confirmation of those arrangements through the 1985 Agreement.  The resolution of this issue, however, comes down to the fact that there is no written agreement that sets out the terms regarding any joint operation of the two systems.  The "joint operating arrangements" referred to in the 1985 Agreement simply evolved on an *ad hoc* basis over the years, and the parties implicitly acknowledged those arrangements through oversight by their respective City Managers and City Councils.  As such, there is no set of fixed, non-evolving, specific terms regarding the management of TWU (or any joint operation) that the Court could analyze to determine whether such agreed-upon terms are collateral to the 1985 Agreement.

Even if the Court were to consider the "arrangements" as an agreement (or agreements) between the parties, the continuing oral agreements as to the joint operating arrangements would be

Page 19

collateral to the 1985 Agreement.  The joint operating arrangements are not central to the main purpose of the 1985 Agreement which was, essentially, to build and finance the waterworks for the Millwood Reservoir.   Although the "continued joint operation" of the two Cities' systems was contemplated by the parties in the 1985 Agreement, the operation and management of the Cities' water and sewer systems is a distinct and different obligation from any imposed by the 1985 Agreement.   Any "joint operating arrangements" previously contemplated by the parties are, therefore, collateral, and as such, fall outside the scope of the narrow arbitration provision in the 1985 Agreement. *See Duluth Clinic*, 413 F.3d at 790 (holding that, because a letter of understanding and interim coverage memo created an obligation separate and distinct from the collective bargaining agreement, the dispute presented was collateral and not subject to arbitration); *Cornell Univ.* 942 F.2d at 140 (holding that side agreement of distinct and different obligation is collateral to the agreement).

Furthermore, without a written agreement, there can be no evidence of an intent of the parties to incorporate specific terms of the joint operating arrangements into the 1985 Agreement.  Arkansas law allows for agreements to be construed together as a single agreement "[w]hen a contract refers to another *writing* and makes the terms of that writing a part of the contract." *Ingersoll-Rand Co. V. El Dorado Chemical Co.*, 373 Ark. 226, 233 (Ark. 2008) (emphasis added).  "In order to incorporate a separate document by reference into a contract, the reference must be clear and unequivocal, and the terms of the incorporated document must be known or easily available to the contracting parties." *Id.* (internal quotation omitted).  Because there is no *written* agreement between the parties to this case, specifically setting forth the terms of the "joint operating arrangements" referred to in the 1985 Agreement, there is no agreement to incorporate by reference. Not only is

Page 20

there no document to reference in this case, the terms of the oral agreement are not completely known and, in fact, are disputed.  Incorporation by reference, therefore, is not an available mechanism to bring any "joint operating arrangements" into the purview of the arbitration clause of the 1985 Agreement.[8]

The Court heard extensive testimony and admitted numerous exhibits which were extrinsic to the 1985 Agreement, as the Court found that they could be admitted in order to clarify the above-mentioned ambiguities in the 1985 Agreement.  The only conclusion that the Court was able to reach from hearing this evidence is that any agreement to jointly operate the two Cities' water and sewer systems is unwritten and unspecific; has evolved and changed over the years; and is not susceptible to clear definition.  The parol evidence which was admitted related almost exclusively to Arkansas City's first enumerated dispute, which the Court has now found not to be subject to arbitration.  Therefore, while the admission of extrinsic evidence aided the Court in making its ultimate determination regarding Arkansas City's first dispute, the admission of parol evidence was essentially of no legal effect since the evidence could not sufficiently clarify the ambiguities which existed in the 1985 Contract, because ultimately nobody, not even the parties to this case, can produce specific, arbitrable terms, where no comprehensive agreement actually exists.

The Court has belabored this dispute due to the fact that it appears to be the most weighty

_____

[8] The previous contracts between the parties, while addressing joint operation of the two Cities' systems in a general way, do not contain any terms which provide for how such operation is to be managed.  The "joint operating arrangements" referred to in the 1985 Agreement appear to refer to the *ad hoc* arrangements made over the years, and not specifically to the general provisions of the parties' previous contracts.  Moreover, the dispute that Arkansas City is requesting be compelled to arbitration is a dispute regarding management issues that have not been specifically addressed in any written agreement between the parties – and not, generally, the joint operation of the systems.  TWU is, in fact, still being jointly operated by the two Cities – just not managed in a way that is agreeable to the officials of both Cities.

of all the disputes enumerated by the parties.  Both parties have undoubtedly spent countless hours, and countless taxpayer dollars, litigating this issue – in an action to compel arbitration, which will not and cannot finally resolve the real disputes over which the parties are squabbling.  The only possible result of this litigation, other than the ruling that the Court has made, would have been to compel the dispute to arbitration – where the parties would have simply presented their same dispute, based on a non-existent agreement – to an arbitrator.  While the Court finds that this dispute is not subject to arbitration, the Court nevertheless strongly encourages the parties to work together to amicably and expediently resolve their differences, so that taxpayer money and city revenues might be better spent on actually improving the operation and management of the Cities' water and sewer systems (perhaps through the negotiation of an actual written agreement) instead of on litigation that basically boils down to time-consuming and expensive political posturing.

### 2.   AR2: TEXAS CITY'S SALE OF MILLWOOD WATER TO OTHER TEXAS CITIES

Arkansas City's second enumerated dispute concerns Texas City's sale of water originating from the Millwood Reservoir to other Texas cities.  Arkansas City contends that Texas City is in violation of Section 1 of the 1985 Agreement due to its selling of water from the Millwood Reservoir to other Texas cities, because Texas City has not obtained the approval of Arkansas City's Board of Directors to do so.  (*See* Doc. 1-1, § 1).  Texas City contends that it has sold water from the Millwood Reservoir to other Texas cities since 1986, when water from the Millwood Reservoir was first commingled with water from the Lake Wright Patman Reservoir, and that it has obtained the "express approval of Arkansas City's Board of Directors," which is not required by the 1985 Agreement to be in writing.  Texas City further argues that it owns title to water from the Millwood

Reservoir once it passes to Texas.

Arkansas City was aware when it signed the 1985 Agreement that Texas City had contracts with other Texas cities to supply those cities with water from the Lake Wright Patman Reservoir. Arkansas City acknowledged those contracts to supply other Texas cities in the 1969 Contract. (Doc. 4-3, § 19). Since the water systems of the two Cities are interconnected, both Cities would have been aware that water from the Millwood Reservoir would be necessarily and inextricably commingled with water from Lake Wright Patman and sold to other Texas cities from the day Millwood Reservoir went on stream. However, whether or not Arkansas City has consented to Texas City's sale of the water is not for this Court to decide, as such a determination would go to the merits of the dispute. The 1985 Agreement specifically requires that Texas City obtain "the express approval of Arkansas City's Board of Directors" before providing other Texas cities with water from the Millwood Reservoir. These terms are unambiguous, and Texas City's duty to obtain approval is a duty clearly "arising out of" the 1985 Agreement. As such, Arkansas City's second dispute falls within the purview of the arbitration clause of the 1985 Agreement and is subject to arbitration.

### 3.  AR3: ARKANSAS CITY'S REQUEST FOR INSPECTION OF ATTORNEYS' FEES STATEMENTS

Arkansas City's third dispute concerns Texas City's failure to allow Arkansas City to inspect attorney's fee statements sent to Texas City by its legal counsel, the amount of which TWU was allegedly directed to pay by Texas City's City Manager. Section 6 of the 1985 Agreement provides that "[a]ll records and accounts kept by [either city] pertaining to the operation of its water system . . . shall be open to inspection . . ." Texas City contends that Arkansas City does not have the right

to inspect its attorney's fee statements because the attorney's fees represented on the requested statements were paid from "enterprise funds" belonging to Texas City and not paid directly by TWU.

TWU's former finance director, Wilbur Stanley, testified at trial that the enterprise funds from which the attorney's fees at issue are paid are comprised of revenue collected by Texas City for water payments from other Texas "member cities." Stanley testified that each City's enterprise fund is essentially a vehicle to record the revenue and expenditures of the water and sewer operations for each City. Stanley also testified that, even though certain payments are made directly to Texas City, all Texas City is doing is billing and collecting money to pass on to TWU and that, had Texas City not withdrawn money from its enterprise fund, that money would have been remitted to TWU.

Based on the evidence presented, the Court finds that there is a question as to whether the attorney's fee statements requested by Arkansas City constitute records "pertaining to" the operation of the Cities' jointly operated water system. "Pertaining to" is analogous to the "relating to" language that the Eighth Circuit found to be broad in relation to arbitration clauses. The inclusion of the phrase "pertaining to" in Section 6 would, therefore, seem to result in subjecting a broad array of records to the records inspection requirement, not necessarily limited to those records concerning funds paid directly by TWU. Because "[a]n order to arbitrate [a] particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute," *Duluth Clinic*, *Ltd.* 413 F. 3d at 788 (internal quotation omitted), the Court finds that Arkansas City's third enumerated dispute is a dispute as to an obligation (allowing inspection of records) arising under the 1985 Agreement and is, therefore, subject to arbitration. Texas City may present any defenses it may have as to why it did not allow inspection of its records to the arbitration panel, and the arbitration panel may then consider those

defenses on their merits.

### 4. AR4: TEXAS CITY'S PLANNED TRANSFER OF WATER TREATMENT FUNCTION TO RIVERBEND

Arkansas City's fourth dispute concerns Texas City's alleged planned transfer of the water treatment function of its water system from Lake Wright Patman to Riverbend Water Resources ("Riverbend"). Arkansas City alleges that Texas City has a plan to transfer its water treatment to Riverbend, an entity created by Texas statute, which Arkansas City contends would violate the 1985 Agreement, because the result of such action would be that Texas City would no longer be able to meet its reciprocal obligation under the 1969 Contract and 1985 Agreement to provide treated water to Arkansas City from Lake Wright Patman. Arkansas City asserts that, in the event that this hypothetical result occurs, it would cost approximately $9,000,000 to install cutoff valves in the TWU water distribution lines to enable Arkansas City to cut off the flow of Millwood Reservoir water to Texas City. Texas City contends that it has no plans to transfer the water treatment function of its water system to Riverbend. Further, Texas City has reiterated that it will comply with the 1969 Contract provision (Doc. 4-3, ¶ 21) requiring Texas City to obtain Arkansas City's consent before selling the Lake Wright Patman facilities.

Based on the evidence presented by the parties and the testimony at trial, the Court finds that Arkansas City's fourth dispute is too speculative to comprise an actual dispute, as Texas City appears to have no concrete or immediate plan to transfer water treatment away from Lake Wright Patman. The Court finds, therefore, that Arkansas City's fourth dispute is not subject to arbitration, as the evidence has shown that there is no current dispute to arbitrate.

### 5. TEXAS CITY'S ENUMERATED DISPUTES

Texas City listed three disputes for which it seeks arbitration. Two of the disputes are

directly related to monies paid under the 1985 Agreement.  Texas City claims that it has overpaid its contracted share of the bonded indebtedness in excess of $200,000 and has overpaid its funding allocation of expenses covering a period of eight years.  The arbitration clause specifically requires arbitration of "any dispute . . . as to any amounts due hereunder . . ." (Doc. 1-1, § 16).  The 1985 Agreement contains a schedule of payments required to amortize the cost of the waterworks project and a provision for payment of water supplied and expenses incurred.  *Id.* at § 5.  Texas City's disputes concerning overpayments arise out of the 1985 Agreement and are, therefore subject to arbitration.

The third Texas City dispute relates to title to water supplied by Arkansas, and a hold-harmless clause for third party liability.  Section 17 of the 1985 Agreement provides that title to the water supplied by Arkansas City will pass to Texas City at the point of delivery to Texas City.  Section 17 also contains a hold-harmless provision wherein the parties agree to hold the other harmless from any claims relating to the "transportation, delivery or disposal of water delivered under this Agreement after title has passed to such party."  Texas City contends that Arkansas City is in violation of this provision due to its claim that Texas City is selling water to other Texas cities in violation of Section 1 of the 1985 Agreement, since, under Section 17 of the 1985 Agreement, title to the water would have already passed to Texas City before Texas City sells and provides the water to the other Texas cities.  Little to no evidence was presented at trial to further clarify the nature of this dispute.  Nevertheless, the hold-harmless obligation is an obligation arising out of a specific provision of the 1985 Agreement.  To the extent there is any dispute to arbitrate, it would fall under the arbitration provision of the contract.

Additionally, as to all of Texas City's enumerated disputes, Arkansas City has agreed and

conceded that the disputes – if considered by the Court – should be subject to arbitration.

## III.  CONCLUSION

For all of the reasons set forth above, IT IS ORDERED that Arkansas City's Application to Compel Arbitration is GRANTED IN PART and DENIED IN PART.  The Application is denied as to Arkansas City's first and fourth disputes (as enumerated in Section I, *supra*), and granted as to the second and third disputes.

IT IS FURTHER ORDERED that Texas City's request for its enumerated disputes to be compelled to arbitration is GRANTED as to all three disputes.

The Court therefore directs the parties to proceed to arbitration of Arkansas City's second and third enumerated disputes (AR2 and AR3, Section I, *supra*) and Texas City's three enumerated disputes (TX1-TX3, Section I, *supra*) in accordance with the arbitration provision of the 1985 Agreement.

IT IS SO ORDERED this 6th day of July, 2012.

*/s/ P. K. Holmes,* III
P.K. HOLMES, III
CHIEF U.S. DISTRICT JUDGE